Filed 6/18/14  P. v. Washington CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B240012 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA115915) |
| v. | |
| GREGORY LEE WASHINGTON et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County.  Ricardo R. Ocampo, Judge.  Affirmed as modified.

Holly J. Jackson, under appointment by the Court of Appeal, for Defendant and Appellant Gregory Lee Washington.

Ronald White, under appointment by the Court of Appeal, for Defendant and Appellant Joseph Anthony Adams.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant Brandon Marquice Smith.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Appellants Gregory Lee Washington, Joseph Anthony Adams, and Brandon Marquice Smith appeal from judgments entered against them following their convictions by jury of two counts of second-degree robbery (Pen. Code, § 211).[1]  As to both counts, the jury also found to be true firearm allegations pursuant to sections 12022, subdivision (a)(1) and section 12022.5, subdivision (a), and the allegation that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).  Smith admitted a prior prison term allegation (§ 667.5, subd. (b)).

The trial court sentenced Washington to 26 years in state prison.  Adams received a sentence of 28 years in state prison.  The trial court sentenced Smith to 31 years and eight months in state prison.

Appellants contend the People committed *Brady* error (*Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).  They also raise contentions relating to the sufficiency of the evidence to support the robbery convictions and gang enhancement finding.  They contend the trial court erred in its denial of motions to: (1) bifurcate trial on the gang enhancements; (2) disclose juror information; and (3) specially instruct the jury. Appellants also assert sentencing errors.

We modify appellants' sentences to reflect the corrected sentences for the gang enhancement allegations and Smith's prior prison term enhancement.  In all other respects, the judgments are affirmed.

## FACTS

**Prosecution Case**

*The Robbery*

On December 21, 2010, Ronisha Butler was working as a prostitute on Long Beach Boulevard in the City of Compton.  Sometime between 9:00 and 10:00 p.m. she was approached by a car driven by Otis Hawkins.  They discussed prices and she got into

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

2

the car. Hawkins drove to a Bank of America and went to the ATM. He then drove to a more secluded residential street about a mile and a half away. Butler and Hawkins were about to engage in a sex act when a car pulled up behind them. Smith, armed with a handgun, walked up to Hawkins's car. He opened the driver's door and said something like, "Give me the fucking money." Hawkins handed Smith his money and a black cell phone.

Washington came to the passenger side of the car. He banged on Butler's window with a gun and told her to roll down the window. He demanded she give him her purse. Butler refused and Washington told Smith to get the money from the purse. Butler gave Smith $150. Washington told Butler to give him the "rest of the fucking money" and she gave him an additional $100. Washington and Smith got into a grey or silver Nissan Altima or Maxima, driven by Adams, and left. Hawkins had a second cell phone and used it to call 911. He handed the phone to Butler and followed appellants in his car. An audio recording of the 911 call was played for the jury. Butler tried to get a license plate number as they drove but appellants were "driving crazy." Appellants turned down "back streets" and were driving fast.

Butler recognized all three appellants because she had seen them earlier in the day on Long Beach Boulevard. They were harassing other women working on the street and Adams asked Butler if she had a pimp. Butler put her head down and walked away. She knew if she had responded they would have kidnapped her and taken her away. Butler told the 911 operator that appellants were pimps and had been following her all night. She was unsure if there was a fourth person in the car which she described as an Altima.

### The Investigation

At approximately 9:30 p.m. Los Angeles Sheriff's Department (LASD) Deputy Mike Barraza responded to a robbery call and interviewed Butler and Hawkins. Butler told Deputy Barraza that Hawkins was robbed by three men in front of the Bank of America ATM. Butler testified that she spoke to five or six different police officers on the night of the robbery and told different parts of her story to different officers. She

3

remembered Adams wore a black shirt, Washington wore a black hoodie and grey pants, and Smith wore a black hoodie jacket with green stripes and black pants.

LASD Sergeant Noe Garcia heard a radio transmission about a robbery at gunpoint. The perpetrators were African-American males and the vehicle involved was "a green Nissan Altima or Maxima." An updated broadcast stated the color of the car was silver or grey, and a partial license plate description was "3MM." He stopped one car that was similar to the description broadcast earlier but immediately let it go when he determined the driver was female and alone in the car. Another broadcast stated the suspects were three or four African-American men in a grey Altima and mentioned a black hooded sweatshirt. Sergeant Garcia continued to look for the suspects' vehicle on Long Beach Boulevard.

At approximately 11:00 p.m., Sergeant Garcia saw a Nissan Altima that matched the description in the broadcast traveling southbound on Long Beach Boulevard. He made a U-turn and began to follow it. The car was several blocks ahead of Sergeant Garcia and even though he sped up he was not "able to gain ground at all." The Nissan made a fast turn westbound and Sergeant Garcia lost sight of it. Sergeant Garcia spotted the Nissan in the drive-through lane of a McDonald's restaurant. He pulled his vehicle behind the Nissan at McDonald's. He activated his lights, called for backup, and held the occupants of the vehicle at gunpoint until other officers arrived. The Nissan was registered to appellant Adams's mother. The license plate was 6HMV526. All three appellants were in the vehicle and one was wearing a black hoodie.

The day after the robbery, Butler met with LASD Detective Brian Richardson at the Compton police station. She read, signed, and understood a standard admonition form before viewing any photographs. The interview was recorded. When Butler viewed the first photo six-pack, she was unsure because the photos in position number one and position number six looked like Adams. The photo used in the six-pack was an old booking photo of Adams. She testified that she initially circled two photos on the six-pack but Detective Richardson gave her a new card and asked her to circle the person

4

whom she was sure was Adams. After thinking about it for a while she eventually selected his photo in position number six and wrote, "Following me all day. Driver of the car. Harassing me. Driving a Nissan Maxima or Altima." Butler testified she "balled" up the photo six-pack on which she had circled two photos.

Detective Richardson initially testified that Butler showed no hesitation in selecting Adams from the photo six-pack. He later agreed that she spent some time deciding between two photos before circling the person she believed committed the crime. He denied she ever circled two photos and did not know what Butler meant when she talked about redoing it so she did not "look stupid." When he listened to the recording of Butler's interview, he agreed that another six-pack was pulled but he did not know why.

Butler identified Washington from another photo six-pack and wrote, "My side of the window. Banged on it. Told me to give him my money. Gestured to the gunner to tell him to get the rest of my money. I gave him a hundred dollars." She identified Smith from a photo six-pack and wrote, "Jumped out of the car. Opened the driver door. Pointed the gun at friend. Told him to give him money and phone. Pointed gun at me for me to empty my wallet. He took the remainder of my money, $150."

Butler, who received immunity from prosecution for prostitution, positively identified all three appellants at trial. She had previously described Adams as light-skinned and "short as fuck." She described Washington as tall. Counsel had appellants stand together in court and Detective Richardson acknowledged that Adams was taller than the other two appellants. Butler insisted Adams was "short and fat" and explained that people tend to look short when they are overweight. Butler agreed that Washington was not tall but explained that he had been standing on the curb next to her window and she had been sitting down. Butler told Detective Richardson that Smith had a beard. His booking photo from the night of the robbery showed he had a beard growing out. At trial, Smith was clean shaven.

When the appellants were arrested, Washington was wearing a black hoodie and

5

grey sweatpants, Adams was wearing a black sweater and black pants, and Smith was wearing a white T-shirt and jeans. A black jacket with green stripes was not found, nor was a gun or the cell phone belonging to Hawkins. Smith had $11 on his person, and Adams and Washington had no money.

### Gang Evidence

LASD Detective Grant Roth testified as a gang expert. After detailing his background, training, and experience, he testified concerning the culture and habits of criminal street gangs. He explained the various ways a person can join a gang and how they show allegiance to the gang by committing crimes. He explained the importance of respect in gang culture and how respect equals fear. He testified about the diminishing importance of gang colors and tattoos in the modern street gangs because it made the gang members more easily identifiable to law enforcement. Detective Roth and his partner handled all of the gangs in Lynwood. The Palm and Oak Crips gang[2] (Palm and Oak) was established in the 1970s and had about 110 documented members at the time of trial. Detective Roth had personal contact with approximately 30 Palm and Oak gang members and investigated crimes in which they were suspects or victims.

The principal and primary activities of the Palm and Oak gang were criminal in nature and included vandalism, burglaries, robberies, assaults with or without firearms, murders, extortion, narcotic sales, and pimping. The gang's members "consistently and repeatedly" engaged in those activities. Detective Roth testified to the commission of two predicate crimes committed by members of the Palm and Oak gang. Kevin Donte Williams was convicted of carrying a loaded firearm in 2006, and Cory Partridge was convicted of vehicle theft in 2007. Williams and Partridge both admitted to law enforcement that they were members of the Palm and Oak gang.

Detective Roth opined that Washington, Adams, and Smith were members of the Palm and Oak gang based on several factors. Detective Roth reviewed appellants' field identification cards, their tattoos, and their known associates. Furthermore, all appellants

---

[2] The name came from the intersection of the streets at the center of their territory.

self-admitted to membership of the Palm and Oak gang. During a postarrest interview, Adams said his moniker was Joe Joe and Washington stated his moniker was Scooter. Smith stated he was a member but did not provide a moniker.

Responding to a hypothetical question based on the facts of this case, Detective Roth opined that the crimes benefitted the Palm and Oak gang. Three individuals from the same gang working together in the commission of the crime helped boost their individual reputations and word of the crime would get around. Butler's refusal to work for them as a prostitute was "a slap in the face to them" and "a show of disrespect." Failure to retaliate would be a sign of weakness. By robbing Hawkins and Butler, appellants showed they were violent, able to handle business, and prepared to do what it takes to earn money for the gang. Detective Roth testified that because robbery is a means of getting money for the gang, it is common for gang members to go outside their territory to commit such crimes. Generally, gang members committing a robbery invoke the gang's name only if they are within their own territory or if the victim was a rival gang member.

**Washington's Defense Case[3]**

Dr. Mitchell Eisen testified as an expert on eyewitness memory and identification. He explained how stress and trauma impacts memory and how the presence of a weapon can dominate a witness's attention. Eisen also testified about the suggestive nature of six-pack photo lineups. Accurate identifications usually occur in under 30 seconds. The witness expects the photo lineup to include the suspect and will find the photo that most closely matches their memory. Dr. Eisen testified that it was possible to get some details wrong about an identification such as the person's height and still correctly identify the person.

---

[3]     Adams and Smith did not present any evidence on their own behalf.

# DISCUSSION

## I.   *Brady* and *Trombetta-Youngblood* [4] Motions

Appellants contend the trial court erred when it refused to dismiss the case for discovery violations and destruction of evidence. [5]

### A.   *Background*

#### 1.   **Six-Pack Photo Identification by Butler**

On cross-examination, Butler denied she rewrote the information on the photo six-packs.  Counsel showed her the transcript of her interview to refresh her recollection but Butler maintained she did not "re-do" the six-packs.  After Butler was excused and prior to leaving the courtroom, she told the prosecutor she did re-do a six-pack regarding Adams.  The prosecutor promptly informed the trial court and counsel that he wanted her "to go back up and clarify" because he was "trying to do this right."  He stated, "She told me.  I got to do it."

Butler testified that two photos initially looked familiar when she first looked at the Adams photo six-pack.  She was "debating on one of them being short . . . and light-skinned" and circled both photos.  Detective Richardson gave her another copy of the six-pack and asked her to circle the photo that she was sure was Adams.  She "balled  . . . up" the six-pack with the two circled photos and "after talking and looking at the pictures" identified Adams on the new photo six-pack.  The prosecutor then called Detective Richardson and asked him if Butler picked anyone other than Adams in his six-pack.  Detective Richardson said she did not.  Counsel for Adams requested a sidebar and court was recessed.

---

[4]   *California v. Trombetta* (1984) 467 U.S. 479, 488-489 (*Trombetta*), and *Arizona v. Youngblood* (1988) 488 U.S. 51, 57-58 (*Youngblood*).

[5]   Appellants join arguments of the others to the extent they may inure to their benefit (Cal. Rules of Court, rule 8.200(a)(5)).  Where appropriate we discuss each argument in reference to the appellant asserting it.

Adams's counsel argued there was a *Brady* violation and moved for a mistrial or a dismissal. He argued the police report did not accurately reflect what took place at the photo identification of his client during Butler's police interview. Washington's counsel also moved for a dismissal based on a *Brady* violation, and Smith's counsel joined.

The trial court noted that the discarded six-pack was not turned over by the investigating officers. Information about it was not included in Detective Richardson's report and the court was concerned with Detective Richardson's testimony that Butler had not identified anyone but Adams. The court found this was exculpatory evidence that was not turned over to the defense and stated, "The question as to *Brady* though is, *Brady* is obviously dangerous when you find the *Brady* information after the fact." The court noted that the evidence had been brought out in front of the jurors and all counsel and stated, "[t]he question is if they can effectively cross-examine based on that." The court ordered the prosecution not to talk to Detective Richardson before he resumed his testimony and sustained a defense objection to the prosecution asking leading questions that would alert him to the information counsel had received from Butler regarding the photo six-packs. The court denied without prejudice the mistrial and dismissal motions. The court wanted to hear further testimony with respect to the *Brady* issue to determine whether the defense was prejudiced.

Detective Richardson returned and testified that he believed the entire interview with Butler was recorded. Under questioning by defense counsel, Detective Richardson testified that he believed Butler chose Adams's photo immediately and he did not remember her saying it might be someone else. He would have written in his report if Butler had pointed to someone else and was not sure of her identification. Detective Richardson was asked to review a portion of the transcript of the Butler interview and after further questioning remembered Butler narrowing down her choice between two photos. Detective Richardson listened to the portion of the taped interview where Butler stated, "Redo it? Yeah, so I don't look stupid?" He testified he did not know what that referred to, and he did not remember doing a second six-pack.

9

The following day, Detective Richardson resumed the stand and testified that his responsibilities included collecting and turning over evidence that might point to innocence, including evidence that might challenge a witness's credibility. If a witness circled two photos on a six-pack he would have an obligation to turn that over to the prosecution. He would be subject to discipline or firing if he discarded something like that or falsified reports or evidence. Portions of the audio recording were played again in court. Detective Richardson stated he had listened to the interview on his own overnight. He agreed it was "undeniable" a second six-pack was pulled but did not remember why it was done. He insisted it was not because Butler had circled two photos. He remembered Butler was confused and may have "put[] the wrong defendant as far as what they did, rather who had the gun or who didn't have the gun." The first six-pack was not documented in the police report and was not turned over to the prosecution. He testified that Butler did not ball up or discard any six-pack. That had "never happened before" and he would remember it. He did not include in his report that Butler had to "redo" the six-pack because he believed it was irrelevant.

After Detective Richardson's testimony, defense counsel renewed the motion to dismiss based on a *Brady* violation. In the alternative, counsel asked the court to declare a mistrial for prosecutorial misconduct because law enforcement is deemed an arm of the prosecution. The court denied the motions. The court had reserved ruling on the *Brady* issue because it wanted to assess Detective Richardson's entire testimony to see "whether and what kind of prejudice resulted." The court then commended all counsel stating, "I don't believe that the cross-examination or the challenge to that effect or the challenge due to the lack of evidence or the failure to turn over what could have been challenged by cross-examination more effectively than what I have heard from all counsel. I mean, the counsel has confronted--I am not the trier of fact, but I think effectively has been able to explore that issue with the detectives. And it's raised some issues, I think, of credibility, whether it be with the witness or with the victim--alleged victim--or the witness,

10

Detective Richardson.  So, I don't think that there is any effect that would have resulted other than what has been established in cross-examination."

At the close of evidence, the trial court denied appellants' *Trombetta-Youngblood* motion stating the destruction of evidence was a credibility issue, and appellants were not prejudiced.

### 2.      Field Show-Up Involving Butler

During a lunchtime break in trial, Butler informed the prosecutor that she had participated in a field show-up.  The prosecutor and defense counsel were unaware the field show-up had occurred.  Butler was questioned outside the presence of the jury.  Butler testified that shortly after the robbery two police officers asked her to go with them.  She asked them to handcuff her so she would not look like a snitch.  Hawkins was taken in a different car.  Butler was taken to a location where the police had stopped a blue Altima driven by a man who was "dark and very tall."  Butler told the officers, "It wasn't him."

The prosecutor stated he intended to elicit the same testimony before the jury.  All three defense counsel objected.  The trial court indicated that it was inclined to allow the testimony but with an admonishment.  Defense counsel asked for an instruction on late discovery if the testimony was admitted.  The trial court agreed to instruct the jury accordingly.  The testimony was never elicited in the presence of the jury.

### B.      Analysis

#### 1.      *Brady*

Appellants contend the prosecutor violated *Brady, supra,* 373 U.S. 83, by failing to turn over the initial six-pack with two circled photos as described by Butler.  They argue, notwithstanding that the prosecutor did not know of the existence of the six-pack until after Butler testified, the People are responsible for failing to disclose known or unknown exculpatory or impeachment evidence.

Our review is de novo.  (*People v. Letner* (2010) 50 Cal.4th 99, 176 (*Letner*); *People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).)  As our Supreme Court held

11

in *Letner,* "We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence. (*Salazar,* [*supra,* 35 Cal.4th] at p. 1042.)" (*Letner, supra,* 35 Cal.4th at p. 176.) We find no error because evidence of the six-pack was admitted at trial and appellants have failed to establish the materiality element of a *Brady* violation.

Under the federal due process clause and *Brady*, the prosecution has a self-executing duty to disclose to the defense any evidence that is favorable to the accused and material to the issues of guilt or punishment. (*People v. Verdugo* (2010) 50 Cal.4th 263, 279 (*Verdugo*); *People v. Bohannon* (2000) 82 Cal.App.4th 798, 804, disapproved on another point in *People v. Zambrano* (2007) 41 Cal.4th 1082, 1135, fn. 13.) The prosecutor has a duty to learn of any evidence favorable to the defendant known to the police because the rule encompasses evidence known only to the police, even though not known to the prosecutor. (*Strickler v. Greene* (1999) 527 U.S. 263, 280-281; see also *People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 47 *(Meraz)* [prosecutor's duty applies to evidence the "prosecution team" possesses; "prosecution team" includes investigative agencies].)

However the failure to disclose exculpatory evidence does not always violate *Brady*. There are three components to a failure to disclose exculpatory testimony violation: first, there was evidence favorable to the accused; second, the evidence was suppressed by the prosecution; and third, there was prejudice to the defendant. (*Letner, supra,* 50 Cal.4th at p. 176; *People v. Bowles* (2011) 198 Cal.App.4th 318, 325.) Our Supreme Court has explained: "Prejudice in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' (*United States v. Agurs* [(1976) 427 U.S. 97, 112, fn. 20; accord, *U.S. v. Fallon* (7th Cir. 2003) 348 F.3d 248, 252) . . . [Materiality requires that a defendant show] a "reasonable probability of a different result.'" (*Banks v. Dretke* (2004) 540 U.S. 668, 699.)" (*Salazar, supra,* 35 Cal.4th at p. 1043; accord, *Letner, supra,* 50 Cal.4th at p. 176.) The United States Supreme Court has likewise held: "The evidence is material only if there is a reasonable probability that, had

12

the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States v. Bagley* (1985) 473 U.S. 667, 682 (*Bagley*); accord, *Salazar, supra,* 35 Cal.4th at p. 1042.) Defendant bears the burden of showing materiality. (*People v. Hoyos* (2007) 41 Cal.4th 872, 918; *In re Sassounian* (1995) 9 Cal.4th 535, 545.)

The first element was met as the evidence was favorable to the accused. However, the record indicates the evidence was not suppressed as Butler testified at trial that she initially circled two photos on Adams's six-pack and that she "balled it up." Detective Richardson could not remember why a second six-pack was needed but eventually testified that he provided one to Butler. Butler's recorded interview was played for the jury, including the part where she and Detective Richardson talked about "redoing" a six-pack. All counsel extensively cross-examined both Butler and Detective Richardson on the issue. Therefore, although the actual six-pack with the two circled photos was not available to be presented at trial, evidence of its existence was not suppressed. (*Verdugo, supra,* 50 Cal.4th at p. 281, citing *People v. Morrison* (2004) 34 Cal.4th 698, 715 ["In any event, evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery"].)

While there is no doubt that Butler circling two photos on the initial six-pack is favorable to Adams and possibly also to the other appellants, it is not such evidence as would """"put the whole case in such a different light as to undermine confidence in the'""" outcome. (*People v. Jenkins* (2000) 22 Cal.4th 900, 955, quoting *Stickler v. Greene, supra,* 527 U.S. at p. 290.) This is particularly true under the circumstances here, where the information was introduced at trial, and appellants had ample opportunity to cross-examine Butler about her identification of someone else on the six-pack. Not only would presentation of the physical six-pack have added little to what the jury knew, it potentially could have strengthened the prosecution's case. If the discarded six-pack showed two people circled, it bolstered her credibility because she volunteered this

13

information. If the discarded six-pack showed only Adams circled, it bolstered her identification of him. Therefore, appellants have not shown that the impeaching evidence was material within the meaning of *Brady* in that they suffered prejudice. The appellants have not established that they suffered prejudice, that is, appellants have not established there was a reasonable probability the result would have been more favorable to them had the impeachment evidence been timely disclosed. (*Letner, supra,* 50 Cal.4th at p. 176; *People v. Hoyos, supra,* 41 Cal.4th at p. 918.)

The trial court recognized that the prosecution was unaware of the discarded six-pack photo, and that it was law enforcement that failed to turn it over. The trial court did not decide the *Brady* issue on that basis and Adams's argument to the contrary misconstrues the court's ruling. The trial court found that exculpatory evidence was not turned over to the defense but denied the *Brady* claim because it found appellants had suffered no prejudice from the absence of the physical six-pack.

Evidence of the field show-up where Butler stated the person detained was not one of the robbers was not improperly suppressed under *Brady*. The evidence was available to appellants and was not suppressed. More importantly, the evidence was not exculpatory. Butler was taken to view an African-American man who was stopped by law enforcement while driving an Altima. Butler did not identify him as one of the robbers which showed her ability to remember important descriptive details and also strengthened her later identification of appellants. The prosecutor recognized the inculpatory nature of the evidence and wanted it admitted. All three defense counsel objected to its admission.

There is no reasonable probability that had the undisclosed information pertaining to the discarded photo six-pack or the field show-up been provided to defense counsel even earlier, the outcome would have been more favorable to appellants. Accordingly, there was no suppression of evidence and no *Brady* violation.

14

### 2. *Trombetta-Youngblood*

Contrary to appellants' argument, the unavailability of the initial Adams photo six-pack did not deprive them of a fair trial.  The failure to preserve or the destruction of evidence by the prosecution was specifically addressed in *Trombetta* and *Youngblood*.  In *Trombetta*, the court held that the government has a duty under the United States Constitution to preserve evidence "that might be expected to play a significant role in the [defendant's] defense."  To meet this standard, the evidence must "both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra,* 467 U.S. at pp. 488-489.)

Here comparable evidence existed and was presented to the jury.  The recording of Butler's interview which discussed the attempt to "redo" the identification and referenced a second six-pack was played for the jury.  Additionally, Butler volunteered information about the content of the discarded six-pack which was consistent with the recording.

In *Youngblood***,** the court added that, to show a denial of federal constitutional due process from the destruction of such evidence, the defendant must also show that the police acted in bad faith. (*Youngblood, supra,* 488 U.S. at p. 58.)  Our Supreme Court has expressly adopted the holdings of *Trombetta* and *Youngblood*. (*People v.Frye* (1998) 18 Cal.4th 894, 942-943.)

"[A] trial court's inquiry whether evidence was destroyed in good faith or bad faith is essentially factual: therefore, the proper standard of review is substantial evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 831.)  Under this standard, "we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling." (*People v. Roybal* (1998) 19 Cal.4th 481, 510.)  The testimony of a single witness, even if he is a party to the case, may be sufficient. (Evid. Code, § 411.)  We do not decide the credibility of witnesses, as that is the function of the trier of fact. (*People v. French* (1978) 77 Cal.App.3d 511, 523.)

15

Although the court appeared skeptical of Detective Richardson's testimony, it did not make a finding of bad faith on his part. Detective Richardson repeatedly stated he did not remember why a second six-pack was needed and was only able to speculate at the time of trial. He testified that he did not dispose of the first six-pack and that was consistent with Butler's testimony that she "balled it up." Even if one accepts that the first six-pack was discarded, there is no evidence that it was done in bad faith. (*People v. Ochoa* (1998) 19 Cal.4th 353, 417 [negligent failure to preserve evidence does not violate due process].)

## II. Substantial Evidence Supported the Gang Enhancements and Robbery Conviction

### A. Contentions

Appellants contend there was insufficient evidence to support the gang enhancement in connection with the charged offense of robbery. Specifically, Smith argues the prosecution failed to establish that Palm and Oaks Crips was a criminal street gang within the meaning of section 186.22. Washington argues the evidence was insufficient to prove appellants had the specific intent to promote, further, or assist in any criminal conduct by gang members. Adams also challenges the sufficiency of the evidence to support the conviction for robbery.

### B. Relevant Authority

A gang enhancement finding is reviewed under the substantial evidence standard. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657 (*Ochoa*).) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "If the circumstances reasonably justify the trier of

16

fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*Ibid.*)

To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) The crime must be "'gang related.'" (*People v. Gardeley* (1996) 14 Cal.4th 605, 622, 625, fn. 12; *People v. Castaneda* (2000) 23 Cal.4th 743, 745 [gang enhancement statute "increases the punishment for some gang-related crimes"]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 56 [gang enhancement statute "applies when a crime is gang related"].) A defendant's mere membership in the gang does not suffice to establish the gang enhancement. (*People v. Gardeley, supra*, at pp. 623–624.) Rather, "'[t]he crime itself must have some connection with the activities of a gang.'" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199.) "[T]o prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs. [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048.)

### C. The Prosecution Proved the Primary Activities Element of the Gang Enhancement

Section 186.22, subdivision (b)(1) provides an enhanced sentence to a person convicted of a felony committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*People v. Gardeley, supra,* 14 Cal.4th at pp. 616–617.) It applies to "gang-related" crimes. (*People v. Castaneda, supra,* 23 Cal.4th at p. 745.)

"To trigger the gang statute's sentence-enhancement provision (§ 186.22, subd. (b)), the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322 (*Sengpadychith*).) The requirement may be satisfied by the testimony of a police gang expert who opines that the primary activities of the gang are statutorily listed crimes, including crimes reflecting past conduct by members of the gang. (*Ibid.; Gardeley, supra,* 14 Cal.4th at p. 620.)

Detective Roth's testimony, combined with the facts of the case, provided substantial evidence that robbery was a primary activity of the Palm and Oaks gang. The jury was instructed that a criminal street gang has "as one or more of its *primary* activities" the commission of robbery, vehicle theft, and carrying a loaded firearm.[6] The instruction explained that "to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group."

Detective Roth testified regarding his familiarity with the Palm and Oak gang. He had personal contact with about 20 to 30 members of the gang. It was one of the gangs he was charged with investigating and he investigated about 90 percent of reported Palm and Oak gang crimes in which their members were suspects or victims. He listed the gang's primary criminal activities which included robbery. He described the activities as the chief and principal occupations of the gang and testified that they engaged in those activities "consistently and repeatedly." Appellants were Palm and Oak gang members who had been harassing Butler and other prostitutes on Long Beach Boulevard. Butler walked away from them when they asked her if she had a pimp. Approximately one hour later, appellants robbed Butler and Hawkins at gunpoint.

Appellant Smith relies on *In re Alexander L.* (2007) 149 Cal.App.4th 605, and argues that Detective Roth's testimony was conclusory and without adequate foundation.

---

[6] Each of those crimes is a qualifying primary activity pursuant to section 186.22, subdivision (e). (§ 186.22, subd. (e)(2), (25), & (33).)

18

Smith's reliance is misplaced. In *Alexander L.,* when asked about the gang's primary activities, the gang expert testified "he knew" the gang had committed "quite a few" enumerated crimes. No information establishing the reliability of his opinion was elicited. On cross-examination, the expert testified that the majority of the cases connected to the gang that he had run across were graffiti related. The court found there was not an adequate foundation for his opinion because he did not explain the sources of his information. (*Id.* at pp. 611-612.) In contrast, Detective Roth's opinion was based on his several years of experience investigating gang crimes in general, and in particular the Palm and Oak gang to which he was assigned. Detective Roth was unequivocal that the "primary" activities of the gang included robbery. The court's analysis in *Alexander L.* is not persuasive. (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330.)

### D. The Prosecution Proved the Specific Intent to Benefit the Gang Element of the Gang Enhancement

Sufficient evidence established that appellants acted with "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1); see *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) Because substantial evidence supports a finding that the crimes benefitted the gang, reversal cannot be justified by the possibility that the evidence might have been reconciled with a finding that appellants acted only for personal reasons. (See *People v. Albillar, supra,* 51 Cal.4th at p. 60.)

Even if appellant Washington was correct that the evidence was insufficient to show that the robbery of Butler and Hawkins benefitted the gang, his contention fails. "There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*People v. Albillar, supra,* 51 Cal.4th at p. 67.) Appellants were all members of the Palm and Oak gang. They harassed women on Long Beach Boulevard. They approached Butler but their advances were rejected. They robbed Butler and Hawkins at gunpoint. They attempted to outrun a

19

police car that followed them. They were arrested together a couple of hours after the robbery. These facts combined with Detective Roth's opinion support the jury's finding that appellants associated with each other and assisted in the criminal activity.

Appellant Washington further contends the evidence supporting his gang membership is "suspect" because appellants admitted membership in the "Palm and Oaks Compton Crips" as opposed to the "Palm and Oak Crips." He argues there is no such gang and Detective Roth had never heard of the Palm and Oak gang coming from Compton. Washington's contention is without merit. Detective Roth testified that some gangs "have five or six different ways that they can say the name" of the gang. Adams and Smith lived in Compton and a lot of Lynwood gangs considered themselves to be Compton gangs.

Washington's reliance on *In re Daniel C.* (2011) 195 Cal.App.4th 1350 does not help him. In *In re Daniel C.*, the appellate court determined the evidence was insufficient to support a gang enhancement on a finding the minor committed robbery, where there was no evidence that the minor and his companions acted in concert to rob the store manager of a bottle of liquor, or that they had made it known to the manager they were gang members, or that the minor's act of striking the store manager with the liquor bottle before fleeing the store was anything more than a spur-of-the-moment reaction to the manager's attempt to retrieve the liquor bottle. (*In re Daniel C., supra,* 195 Cal.App.4th at p. 1363.) In fact, the minor told police that his companions were unaware of his intent to steal the liquor bottle; they left the store before he did. (*Id.* at pp. 1354, 1361.)

The instant case is clearly distinguishable in that the crimes were committed by multiple gang members who coordinated their efforts. Smith approached the car from the driver's side, Washington was on the passenger side. They ordered Butler and Hawkins to give up the money. Adams remained in the car and acted as the getaway driver.

### E.     *Substantial Evidence Supported the Robbery Conviction*

Appellant Adams challenges the sufficiency of the evidence solely on the issue of his identification as one of the robbers.

20

Butler testified that she had seen appellants and been harassed by them earlier in the evening. Adams approached her and asked her if she had a pimp. During the robbery, she testified that Smith was on the driver's side of Hawkins's car, and Washington was on the passenger side. She described appellants' car as a grey or silver Nissan Altima or Maxima driven by Adams. Hawkins and she followed appellants' car and called 911. She told the 911 operator that the men who robbed her were pimps who had been following her all night. The car in which all three appellants were apprehended was registered to Adams's mother. Butler described Adams as wearing a black shirt during the robbery and when he was arrested he was wearing a black sweater. The day after the robberies, Butler identified all three appellants in six-pack photo lineups. At trial, Butler positively identified all three appellants and stated that Adams was the driver.

Butler's testimony had some inconsistencies and Adams argues her identification "does not inspire confidence in its accuracy." But inconsistencies and suspicions cannot serve as a basis for overturning the jury's credibility determination, only inherent improbability and obvious falsehood can. (*People v. Thornton* (1974) 11 Cal.3d 738, 754, overruled on other grounds by *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.) We find nothing inherently improbable in Butler's testimony. Adams's arguments to the contrary, credibility issues are for the jury to resolve. (*People v. Lewis* (2001) 26 Cal.4th 334, 361.)

Therefore, viewing the evidence in a light most favorable to the judgment, we believe any reasonable trier of fact could have found Adams guilty of robbery under these facts.

## III. Bifurcation of Gang Enhancement

Appellants contend the trial court abused its discretion by refusing to bifurcate the gang allegations.

### A. Background

Prior to trial, Washington moved to bifurcate the gang enhancement allegations. Smith and Adams joined. They argued the gang evidence was weak and there was

21

"literally nothing to distinguish this robbery from a regular street robbery that [did] not involve alleged gang members or gang associates." The prosecutor explained the gang evidence was relevant to motive. All appellants were admitted Palm and Oak gang members and the gang expert would testify one of the primary activities of the gang was committing robberies. The court indicated that it would review the preliminary hearing transcript prior to issuing a ruling.

After the lunch recess, the court denied the motion. The court indicated that the prosecution's theory was that the robbery was committed with a gang motive. The court stated that there was "no way" it would prevent the prosecution from "presenting evidence as to the motivation of the crime, whether it be, for example, someone kills someone or robs something, because they don't have any money, for example. It might be a weak theory, but that is not for the court to decide if there is a motive or not and how strong that motive is. That is for the fact finder. That is for the jurors to determine or not." The court stated it had analyzed the strengths and weaknesses of the gang evidence and found the probative value of the evidence outweighed the prejudicial effect. Defense counsel again argued that the motive in any robbery is financial gain and there were no facts to show that gang membership or affiliation was the motive in this case. The court acknowledged that robberies can be motivated by financial gain but reiterated that the court would not prevent the prosecution from presenting its theory that the robbery was committed for gang-related purposes.

### B. Relevant Law

The denial of a motion to bifurcate the trial of a gang enhancement is reviewed for abuse of discretion. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050 (*Hernandez*).)

While "[t]he Legislature itself has specifically recognized the potential for prejudice when a jury deciding guilt hears of a prior conviction . . . . the Legislature has given no indication of a similar concern regarding enhancements related to the charged offense, such as a street gang enhancement." (*Hernandez, supra,* 33 Cal.4th at p. 1049.) "Evidence of the defendant's gang affiliation--including evidence of the gang's territory,

membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like--can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id.* at pp. 1049-1050.) Further, in instances where evidence would be inadmissible at the trial of the substantive crime as unduly prejudicial when no gang enhancement is alleged, the court may still deny bifurcation. (*Id.* at p. 1050.) "[T]he trial court's discretion to deny bifurcation of a charged gang enhancement is similarly broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Ibid.*)

### C.    Analysis

The gang evidence was relevant in this case to prove the motive for the robbery and to prove the participation of each of the three appellants in the coordinated effort. Detective Roth testified that the Palm and Oak gang engaged in pimping. Butler testified that she saw appellants before the robbery harassing women on Long Beach Boulevard. Adams specifically asked Butler if she had a pimp. Butler kept her head down and walked away from appellants. Detective Roth also explained the importance of respect in gang culture. If gang members were ignored, they would interpret it as a sign of disrespect and have to get back at that person. Detective Roth testified that gang members committed robberies for purposes of prostitution and to make money for the gang. A few hours after Butler disrespected appellants, they robbed her and Hawkins at gunpoint.

The gang testimony was relevant and not so prejudicial that the prejudice outweighed its probative value, as it was not unduly inflammatory in comparison to the evidence that the appellants were armed and banged on the windows and demanded money from Butler and Hawkins seated in the car. The concept of "undue prejudice" within the meaning of Evidence Code section 352 is not so sweeping as to include any

23

evidence the opponent finds inconvenient.  Evidence is not prejudicial under section 352 merely because it undermines the opponent's position or shores up that of the proponent. (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

Furthermore, the trial court gave CALCRIM No. 1403.  That instruction effectively told the jury that they were to consider the gang evidence only in connection with the gang allegation or that appellants had a motive to commit the robbery, and the jury was not to consider the gang evidence as propensity evidence.  We see nothing in the record to suggest that the jury considered the gang evidence for an improper purpose, and we presumed the jury followed the limiting instruction.  (See *People v. Waidla* (2000) 22 Cal.4th 690, 725.)

Appellant Smith relies on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*).  *Albarran* did not concern bifurcation.  In *Albarran*, the defendant was tried on substantive charges with gang allegations.  A "panoply" of "extremely inflammatory" gang evidence was admitted at trial over defense objections.  (*Albarran, supra,* 149 Cal.App.4th at p. 227.)  The jury found the defendant guilty of the substantive charges and found the gang allegations true.  However, the trial court granted the defendant's motion for a new trial on the gang allegations on the ground of insufficiency of the evidence, and the prosecution dismissed the gang allegations.  On appeal, the defendant asserted that the court should have granted a new trial on the substantive counts because the gang evidence was so inflammatory and irrelevant to the substantive counts that it had prejudiced him on the substantive counts.  (*Albarran, supra*, at p. 217.)  The Fourth District majority agreed with the defendant.  (*Albarran, supra,* at p. 227.)  "[C]ertain gang evidence admitted was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt."  (*Albarran,* at p. 228.)  In the majority's view, the gang evidence's "paramount function . . . was to show Albarran's criminal disposition . . . ."  (*Albarran, supra*, at p. 228.)

24

*Albarran* has no bearing here. The gang evidence in this case was not inflammatory or extraordinarily prejudicial. Detective Roth provided background information about gangs and their culture and testified that appellants were gang members. He described two predicate offenses committed by people unconnected with appellants except by the fact that they were also Palm and Oak gang members, and he explained how the robberies benefitted the Palm and Oaks gang.

The gang evidence was intertwined with the substantive offenses and was not unduly prejudicial. It showed the robbery was done to seek revenge on Butler who had disrespected appellants and to put money in the gang coffers. The robbery also showed the coordinated efforts of three gang members working together. Given the court's broader latitude to deny bifurcation when the gang enhancement is charged, appellants have not established that there was a substantial danger of prejudice requiring separate trials.

In sum, the court did not abuse its discretion and did not violate appellants' constitutional rights, as the trial was not rendered fundamentally unfair.

## IV. Juror Contact Information

Appellants contend the trial court erred by denying the motion to disclose juror identifying information. They argue that a "sufficient showing to support a reasonable belief that jury misconduct occurred" was presented to the trial court. We do not agree because appellants' allegations of juror misconduct were speculative, vague, and conclusory, and failed to set forth a sufficient showing to support a reasonable belief that jury misconduct occurred. (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 553-554 (*Rhodes*).)

### A. *Background*

#### 1. Appellant Smith's Motion

On November 14, 2011, approximately one month after the jury's verdict, Smith filed a petition for the release of confidential juror information pursuant to Code of Civil Procedure sections 206, subdivision (g), and 237, subdivision (b). The motion was based

solely on counsel's declaration. The declaration stated, "I was informed that during the course of deliberations one of the jurors was to say that she was 'tired of this case and she was ready to go.'" The declaration also stated, "I was informed that when the verdict was read in open court, several of the jurors appeared visibly upset. In fact several of the jurors were crying. Specifically juror numbers 3, 4, 6, 9, 10, 12 were observed crying in the jury box, during the reading of the verdict." The declaration concluded by stating, "After the verdict was read and recorded the jurors were escorted across the hall in the courthouse into another courtroom. During the movement of the jurors from Department J to the courtroom across the hall, several of the jurors openly cried. One of the jurors was heard to say 'they did not let us review the evidence.'"

### 2. Hearing and Ruling

On December 13, 2011, the trial court found the hearsay allegations in the motion insufficient, stating, "The declaration basically is just hearsay allegations. They are indications of someone hearing something with no statement from that individual or no declaration from that individual as to what they heard." Appellant Smith's counsel stated the case was unusual and argued that the jurors should be questioned "out of an abundance of caution" to find out why they were crying and whether the "impropriety" by Detective Richardson "might have affected their decision." The court denied the motion. The court stated many cases have emotional verdicts that affect jurors because they are asked to make a difficult decision. The court cannot engage in a "fishing expedition" to see why jurors acted the way they did, when there is "no basis whatsoever" other than speculation. The court stated the jurors were told after the trial that if they wished to speak to counsel they would be given an opportunity to do so. All of the jurors indicated they did not want to speak to counsel and asked to be escorted out of the building. The court denied the motion finding that appellants had failed to establish good cause.

### B. Applicable Legal Principles

After a jury verdict in a criminal case, the court's record of personal juror identification information (names, addresses, and telephone numbers) is sealed. (Code Civ. Proc., § 237, subd. (a)(2).) On a petition filed by a defendant or his or her counsel, a trial court may in its discretion grant access to such information when necessary to the development of a motion for new trial or "any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).)

The applicable test for good cause in this context is set forth in *Rhodes, supra,* 212 Cal.App.3d 541. The party seeking disclosure must make "a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the juror[] through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial." (*Id.* at p. 552.)[7] There is no good cause where allegations of jury misconduct are speculative, conclusory, or unsupported, or where the alleged misconduct is not "of such a character as is likely to have influenced the verdict improperly." (Evid. Code, § 1150, subd. (a); see *Rhodes, supra*, at pp. 553-554.)

Trial courts have broad discretion to allow, limit, or deny access to jurors' personal contact information (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1091), and we review the denial of a petition filed pursuant to Code of Civil Procedure section 237 for an abuse of discretion (*People v. Jones* (1998) 17 Cal.4th 279, 317).

### C. Analysis

The court did not abuse its discretion in denying the motion for release of the sealed juror contact information because Smith's motion and the declaration filed by his counsel failed to cite facts "sufficient to establish good cause" for the release of the information as required by Code of Civil Procedure section 237, subdivision (b). The

---

[7] Although *Rhodes* was decided before the revision of section 206 and the enactment of section 237 of the Code of Civil Procedure, the *Rhodes* test remains applicable. (See *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.)

27

claim of juror misconduct was wholly speculative. The accusations of misconduct contained in the motion were based solely on hearsay statements by unknown declarants. During the hearing on the motion, Smith's counsel neither identified the jurors who made the alleged statements nor the person or people who heard the jurors make the statements.

Furthermore, the allegations, even if true, did not establish a reasonable belief that the type of misconduct that would improperly influence the jury did occur. The allegation that some of the jurors were upset or crying does not indicate misconduct. Other factors provide a possible explanation for the jurors reaction. Echoing the trial court's comment, this was a gang robbery case and emotional verdicts are not unusual when jurors are asked to make a difficult decision. Additionally, appellant Smith had a violent, profanity-laced outburst during the reading of the verdicts. He stood up and resisted the bailiff's efforts to restrain him. He was eventually handcuffed and removed from the courtroom.

The remaining allegations involved comments made by unknown jurors. In one instance a juror expressed frustration about the pace of the trial–jury selection began on September 22, 2011, and the verdicts were reached on October 17, 2011. Another comment complained about the jurors' ability to review the evidence. Smith's suggestion that "the jurors were subjected to undue pressure to reach a verdict *before* the weekend" does not find support in the record. The jury deliberated for about five and a half hours on October 13, 2011 and requested several pieces of evidence. After a juror was replaced, the newly-constituted jury deliberated for about four and a half hours over two days. The jury returned a verdict on Monday, October 17, 2011. The jurors were individually polled about each of their verdicts, and every juror confirmed his or her verdicts as to each appellant.

## V.	Jury Instruction–Failure to Disclose Evidence

Appellants argue the trial court erred when it refused their request to instruct the jury with a special instruction regarding untimely disclosure of evidence. They argue that

CALCRIM No. 306 which was modified by the trial court was inadequate. We find no prejudicial instructional error.

Defense counsel proposed a pinpoint instruction based on the prosecution's failure to disclose the initial Adams photo six-pack prepared by Butler and Detective Robinson. The proposed instruction included the following: "This photo six-pack was 're-done' by Ms. Butler @ the request of Detective Richardson. The existence of the original photographic six-pack was disclosed to the defense, for the 1st time, during the jury trial. By this time, the photographic six-pack was either lost or destroyed. In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure. The failure to provide this information to the defense violates the discovery rules which have been designed to insure a fair trial. Because people violated the discovery rules, you may draw an adverse inference to the people's evidence, which may be sufficient to raise a reasonable doubt as to the charges in this case."

The prosecutor argued "the existence of the six-pack . . . was implicitly disclosed" based on the recording, and defense counsel were able to fully cross-examine the witnesses on the issue. The prosecutor objected to the instruction because it incorrectly implied that failure to disclose the evidence was sufficient to raise a reasonable doubt. The court found that disclosure of the recording approximately two weeks before trial was untimely. The court also found the six-pack had never been disclosed because it was either lost or destroyed, and some instruction was appropriate. After a brief recess, counsel reviewed the modified instruction prepared by the court. Defense counsel asked the court to include stronger language to let the jury know they could draw "an adverse inference from [the] untimely disclosure . . . sufficient to raise a reasonable doubt."

The trial court gave the following instruction: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limit set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. Detective Richardson failed to disclose the existence of an original six-pack containing Mr. Adams's

29

photograph shown to Ronisha Butler. In addition, Detective Richardson failed to provide the same original six-pack to the defense. In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure and failure to provide the original six-pack."

"As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." (*Mathews v. United States* (1988) 485 U.S. 58, 63.) Appellants cite no authority persuading us that the instruction here was inadequate. The court's instruction informed the jury of the negative consequences that could arise as a result of failing to follow the discovery rules. The jury was informed that Detective Richardson failed to disclose the existence of the first Adams six-pack and failed to turn it over to the defense. The jury was told they could consider Detective Richardson's failures when evaluating the evidence. The court was not required to go as far as appellants suggest and instruct the jury that Detective Richardson's failures "may be sufficient to raise a reasonable doubt." A jury instruction is improperly argumentative if "it would invite the jury to draw inferences favorable to the defendant from specified items of evidence on a disputed question of fact, and therefore properly belongs not in instructions, but in the arguments of counsel to the jury." (*People v. Wright* (1988) 45 Cal.3d 1126, 1135.)

The evidence regarding the discarded six-pack was presented to the jury and the witnesses were thoroughly cross-examined by counsel. All defense counsel focused on the issue in closing arguments. Adams's counsel argued the absence of the six-pack alone was "enough for reasonable doubt." Washington's counsel argued, "Detective Richardson is a liar. He's the investigating officer on this case. That should cause you a doubt." Smith's counsel argued that appellants could not get a fair trial due to the absence of the six-pack. The jury was able to judge the credibility of Detective Richardson and the impact of the discarded six-pack based on the evidence presented at trial. The inference to be drawn from the evidence was properly presented in closing

30

argument and was not appropriate for the court's instruction to the jury. (*Wright, supra,* 45 Cal.3d at p. 1135.)

## VI. Sentencing Issues

Appellants contend and the People agree that the trial court made several sentencing errors which we address in turn.

### A. *Appellant Washington's Sentence*

Appellant Washington's sentence must be reduced to 18 years and eight months. The trial court sentenced appellant Washington to 26 years in state prison. On count 1, the court sentenced Washington to 14 years comprised of the midterm of three years for the robbery, plus one year for the firearm enhancement (§ 12022, subd. (a)(1)), plus 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)). On count 2, the court sentenced Washington to a consecutive term of 12 years comprised of one year for the robbery (one-third the midterm), plus one year for the firearm enhancement, plus 10 years for the gang enhancement.

Section 1170.1, subdivision (a), provides that "[t]he subordinate term for each consecutive offense . . . shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses." A firearm enhancement under section 12022, and a gang enhancement under section 186.22, are specified enhancements to which the one-third rule applies. (§ 1170.11.)

The trial court selected count 1 as the principal term, and count 2 was the subordinate term. On count 2, the court correctly imposed one-third the midterm for the substantive offense, but imposed the full one year for the firearm enhancement and the full 10 years for the gang enhancement. When a court pronounces a sentence which is unauthorized by the Penal Code, that sentence must be vacated and a proper sentence imposed whenever the mistake is appropriately brought to the attention of the court. (*People v. Massengale* (1970) 10 Cal.App.3d 689, 693.)

Appellant Washington's sentence on count 2 must be reduced to four years and eight months comprised of one year for the robbery (one-third the midterm), plus four

months for the firearm enhancement, plus three years and four months for the gang enhancement.

### B.    *Appellant Adams's Sentence*

Appellant Adams's sentence must be reduced to 20 years and eight months. The trial court sentenced appellant Adams to 28 years in state prison. On count 1, the court sentenced Adams to 16 years comprised of the high term of five years for the robbery, plus one year for the firearm enhancement (§ 12022, subd. (a)(1)), plus 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)). On count 2, the court sentenced Adams to a consecutive term of 12 years comprised of one year for the robbery (one-third the midterm), plus one year for the firearm enhancement, plus 10 years for the gang enhancement.

For the same reasoning applicable to appellant Washington's sentence (see Part VI. A, *ante*), appellant Adams's sentence on count 2 must be reduced to four years and eight months comprised of one year for the robbery (one-third the midterm), plus four months for the firearm enhancement, plus three years and four months for the gang enhancement.

### C.    *Appellant Smith's Sentence*

Appellant Smith's sentence must be reduced to 23 years. The trial court sentenced appellant Smith to 31 years and eight months in state prison. On count 1, the court sentenced Smith to 16 years and four months comprised of the high term of five years for the robbery, plus one year and four months for the firearm enhancement (§ 12022.5, subd. (a)), plus 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)). On count 2, the court sentenced Smith to a consecutive term of 12 years and four months comprised of one year for the robbery (one-third the midterm), plus one year and four months for the firearm enhancement, plus 10 years for the gang enhancement. Appellant Smith admitted a prior conviction and the court imposed an additional three year sentence pursuant to section 667.5, subdivision (b).

For the same reasoning applicable to appellant Washington's sentence (see Part VI. A, *ante*), appellant Smith's sentence on count 2 must be reduced to five years and eight months comprised of one year for the robbery (one-third the midterm), plus one year and four months for the firearm enhancement, plus three years and four months for the gang enhancement.

Furthermore, it appears the trial court erred in imposing three years for the prior prison term enhancement instead of one year. There was one allegation pursuant to section 667.5, subdivision (b). That section states in part that "the court shall impose a one-year term for each prior separate prison term." (§ 667.5, subd. (b).)

## DISPOSITION

The judgments are modified. Washington's sentence is modified as follows: on count 2, a consecutive sentence of one year for the substantive offense (§ 211), plus an additional four months for the firearm enhancement (§ 12022, subd. (a)(1)), plus an additional three years and four months for the gang enhancement (§ 186.22, subd. (b)(1)(C)). Washington's sentence on count 1 is 14 years. His sentence on count 2 is four years and eight months. Total sentence is 18 years and eight months.

Adams's sentence is modified as follows: on count 2, a consecutive sentence of one year for the substantive offense (§ 211), plus an additional four months for the firearm enhancement (§ 12022, subd. (a)(1)), plus an additional three years and four months for the gang enhancement (§ 186.22, subd. (b)(1)(C)). Adams's sentence on count 1 is 16 years. His sentence on count 2 is four years and eight months. Total sentence is 20 years and eight months.

Smith's sentence is modified as follows: on count 2, a consecutive sentence of one year for the substantive offense (§ 211), plus an additional one year and four months for the firearm enhancement (§ 12022.5, subd. (a)), plus an additional three years and four months for the gang enhancement (§ 186.22, subd. (b)(1)(C)). Smith's sentence on count 1 is 16 years and four months. His sentence on count 2 is five years and eight months.

33

Smith's sentence for the prior separate prison term (§ 667.5, subd. (b)), is one year.  Total sentence is 23 years.

The trial court is directed to amend the abstract of judgment to reflect these modifications and to forward certified copies of the amended abstracts to the Department of Corrections and Rehabilitation.  (§§ 1213, 1216.)  The judgments are affirmed as modified.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J. *

FERNS

We concur:

_____, P. J.

BOREN

_____, J.

ASHMANN-GERST

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.